Morning Members of the Court, Opposing Counsel. I'm Michael Christian. I'm here on behalf of the appellants in this case, Lyle and Kevin Thompson. This is an appeal of an I.B.L.A. decision regarding government contested mining claims. I will note that I submitted by E.C.F. a letter identifying supplemental authority to the Court yesterday. The Andrashevsky case? The Andrashevsky case. And my able opposing counsel pointed out to me that I think I had an error in my citation. We found it. Yes. We found the opinion. I expect you could find it, but I wanted to let the Court know about that. I'm aware, obviously, that members of this panel have considered and written decisions on the issue of credibility determinations by an ALJ and an agency reviewing panel's consideration of those credibility determinations. And I expect we'll get into that discussion. I would submit, first, though, that I think the case can be disposed of on the basis that the government did not satisfy its preemptation case, and our arguments to that effect are set forth in detail in our briefing. But briefly, the main points of that are the government's comparison in this case, generally speaking, was to building stone in general, as opposed to the McLarty directive that a comparison may be made between the mineral in question and such minerals generally, common varieties of the same mineral. And we've engaged in a substantial amount of argument with the United States over whether the comparison between the tin cup stone and the wide variety of stone included in the government's mineral report was apt. I think it's worth noting, first, that the government mineral examiner acknowledged that out of the 17 different stones set forth in his survey, only two were potentially common variety, which I think were the platyrylite and the desert varnish, but he acknowledged several times on cross-examination of the record, the range of pages is ER 127 to 130, acknowledged a number of times that he never made a determination about whether any of the stones included in his survey were, in fact, common varieties, whether they were He knew that of the desert varnish and the platyrylite, that some government mineral cells had occurred as to those, but there isn't any evidence in the record that, for example, patent applications had been submitted and rejected as to either of those varieties. And again, he, Mr. Horsberg, the mineral examiner, repeatedly said, I did not make a determination as to whether these were, in fact, common varieties. Frankly, I think the court could stop right there and conclude that the government had not satisfied its prima facie case and the case is over. But what should the comparison be? Isn't the appropriate comparison with other building stones, not necessarily with local quartzite? Well, I don't think it is, Your Honor. I think that McLarty refers to a mineral, and a building stone is not a mineral. And there are a number of decisions. The Pitkin Iron case is one that I've cited to you from a district court, where the court compared mineral to mineral. There are cases from the IBLA where the IBLA itself recognized that the comparison had to be made to the same stone, even if we were talking about building stones. In the Diana J. Foley case, the comparison was limestone and sandstone to limestone and sandstone. And there was no effort made to go outside of that to building stones generally. In the United Mining Corporation case from the IBLA, which we've also cited, the discussion was, the board stated that the comparison had to be made to the same stone. Well, how about Brubaker? I mean, that talks in terms of building materials. And it seems to me it's looking for what the government has to show, or is that if you're claiming that your quartzite is unique, then the question is, do they have to compare it with only other varieties of quartzite? Or can they look to the usage to which the quartzite would be put? And so that if you're looking in a relevant market in an economic sense, as we do in antitrust cases, for example, what's the competitive relevant market? Why should it be limited just to other forms of quartzite? Why wouldn't you look to what would be a substitute in the market for what your client's quartzite is used for? Well, I understand that argument, Your Honor. The problem is, in this case, that even that didn't occur. I mean, the analysis of both Mr. Horsberg and the IBLA, which essentially adopted his analysis wholesale, was from the tin cup stone to known uncommon variety quartzite, which is generally called the Oakley stone. I mean, that's the next reason, is that while lip service was paid to the idea that comparison had to be made even on a characteristics basis to, for example, the limestone of the Pleiadi Rhyolite, almost exclusively, the analysis was between the characteristics of the tin cup stone to a known common variety quartzite, which is, in other words, the only two deposits that Mr. Horsberg actually visited were an Oakley stone deposit, which was patented, and the Ellen W. Stone, which he acknowledged was probably common, I think, as a matter of fact, since that time that the Ellen W. Stone has been patented. And his list of factors was factors that he identified from the Oakley stone. So, in other words, there was no comparison as between the tin cup stone and known common varieties, even of building stone. The analysis of whether there were unique characteristics was as between the tin cup stone and Oakley stone, for all intents and purposes. Now, the Pitkin Iron case, in particular, is a case that recognizes that you can't do that. There are other cases that there's the case that says, if you start comparing gemstones to gemstones, all gemstones will be common variety. So, that's another reason why I think the court can dispose of this case on the basis that a prima facie case wasn't reached because the proper comparison was never made. Once the IBLA reaches the point of saying, all right, we're going to compare this to a known uncommon variety, they've gone off on the wrong path and they can never reach their prima facie case. Now, I'm going to try to leave myself about a minute for rebuttal if I can. We're about done. There are a couple other areas where I think I can quickly mention that clear error was reached. One is, both Mr. Horsberg and the IBLA immediately threw out the characteristic of color and texture as potentially unique characteristics. And the cite that is always made is to the Dunbar case. But the Dunbar case and at least one other, I think, that we've cited to you say, that only in the context of deposits where stone of the same texture and color is widespread. And the same is not true in this case. It's undisputed in the record that the color and texture of the 10-cup stone is unique. The closest that anybody testified to it was Mr. Rodriguez, the Thomson's expert, who mined and sold a similar variety of quartzite in the same geographic areas as the Oakley stone deposits that he called sockeye and testified without dispute that he could obtain a higher price for it, even than the high-grade Oakley stone. But the key is that the color and texture of the stone is not widespread, so Dunbar is not applicable. And I think for the IBLA to wholesale throughout the issue of color and texture on that basis is clear error. I think that the IBLA can be said to have acted arbitrarily in at least one other instance where it accepted Mr. Horsberg's recitation of hearsay statements by unidentified stonyard operators on various subjects, but then rejected Mr. Thomson's own statements about the price he received for his own stone on the basis that he didn't produce contemporary records of the sales. In other words, it applied a double standard to Mr. Horsberg as opposed to Mr. Thomson on essentially the same kind of testimony. I have very little time left. We haven't even touched on the credibility issue. I think this case is very much like the Andrzejewski case. What we have is a situation involving competing experts where the underlying facts are not terribly in dispute. And as Your Honor found in the Andrzejewski case, the ALJ did exactly what the ALJ was supposed to do. And there isn't any other basis to conclude that. Doesn't the Board of Appeals have a broader scope which would permit it to review credibility determinations made by the ALJ? In other words, the Board is not necessarily required to follow the credibility determination made by the ALJ. Well, it's not required to, but first of all, it has to follow its own standards, which in this case I think is set forth in its Carlo decision where the Board said, we're not going to overturn the credibility determination of an ALJ unless there are facts in the record which fatally compromise that determination. And that's what we have to review to see whether there was indeed substantial evidence to support the reversal of the credibility determination. I don't think you're saying the same thing. I think it's different to say is there substantial evidence to support the reversal of the ALJ's credibility determination than it is to say the credibility determination must be given deference unless there are facts in the record which fatally compromise the ALJ's determination. And the IBLA in this case never went through that exercise. At most, it essentially said, well, the ALJ's credibility determination is open to question. But it did not go to the level of Carlo and examine the record to determine whether there were facts which fatally compromise that determination. And I think on that basis, even if we get past the prima facie case issue, the decision should be reversed. Thank you, counsel. Your time has expired. Thank you. We'll hear from the government. Good morning. I'm Warren Durbidge representing the United States Department of Interior, Interior Board of Land Appeals, which is the court has already identified as entitled to substantial deference in review under Administrative Procedure Act of their disposition in invalidating the mining claims at issue in this case. Well, counsel, what about that last colloquy we had? To what extent is the Board of Land Appeals required to defer in turn to the ALJ, particularly with respect to credibility? What's your response to Mr. Christian's argument? Well, I think Mr. Christian doesn't precise, doesn't state the standard correctly. I think the IBLA dealt with that during the course of examining the administrative law judge's decision, and it's set out with considerable care at 168 IBLA 77. It's found in the excerpt of record at page 24. And it recites that the standard is very much different from the case on which Mr. Christian would like to rely, having to do with the National Transportation Safety Board decisions, and the extent to which deference under that system must be accorded to dispositions by an administrative law judge. It's different and has been different with regard to IBLA decisions for a very long period of time. And we've cited the Seminole case, which also was supported by an affirmance by the Ninth Circuit in 1985, and that's the United States v. Dunbar-Stone, 56 IBLA 61, a 1981 decision, which was affirmed by the Ninth Circuit in 1985. And cert was denied by the United States Supreme Court in 1985. Essentially, what that standard recites, and the IBLA deals with it at considerable length, is that in ordinary circumstances, they will defer to the decisions of the ALJ to determine facts, but they are not forestalled from a plenary review of the entire record made by the ALJ to determine whether or not he's followed appropriate legal standards, or whether or not the determinations made by the ALJ on matters of fact are consistent with the entire record under review by IBLA. And that's precisely where the plaintiff's case on trying to maintain that these falls apart. It isn't only the disparity in expert conclusions between Horsberg, the government's mineral examiner, and Cochram, the plaintiff's or appellant's expert, is not the only diffugality in the record. And what IBLA decision clearly establishes, and we've argued in our brief, is that there are some horrible inconsistencies if you accept the conclusions arrived at by the administrative law judge, because he overlooks some very significant, disturbing problems in the record. And I referred to at least one of those in brief, and that is he concluded that the economic vitality of the claims was largely satisfied many years before the date of the hearing, and that Lyle Thompson's father had operated the mining claims as his sole method of support some 26 years before he passed away in 1977. The problem with that was also in the record was the cross-examination of Lyle Thompson, who conceded that the sole source of support for his father was not the mining operation. That was conducted only during three months in the summer, similar to what plaintiff conducted mining operations largely as a hobby, and that his father had a heating oil business in the bulk of the year. So ALJ's conclusion that the sole method of support of the plaintiff's father in years earlier was the mining claims in order to satisfy whether they had economic vitality is clearly not consistent with the record established at the hearing. Did you address the, because of your time limits, would you be sure you addressed the comparator argument that he made, that there was a, you didn't, the IBLA didn't make, and the evidence presented by the government did not make the proper comparisons? Prime aphasia case issue. Yes. Well, the first thing I'd like to say on whether or not prime aphasia case was established is that plaintiff made that argument unsuccessfully also to the ALJ, to the IBLA, and also in district court before Judge Windmill. What examination of the record made before an Interior Board of Land Appeals clearly establishes and Horsberg's mineral report establishes is that over a long period of time of many years, from 1993, many days in 1996, and follow-up examinations in later years preceding the hearing, Mr. Horsberg had substantial experience with examining what was going on on the claims and also conducting a mineral survey. The claim has been made over and over again that there was no comparison made by Horsberg to uncommon varieties of stone. The IBLA decision clearly dealt with that and made reference to the fact that he'd surveyed some 17 varieties of stone as a part of a charted review of the market analysis and that that comparison exists in his written report as well as in his testimony. It's simply not accurate to say that the mineral examiner for Bureau of Land Management, Department of Interior, did a faulty comparison between common and uncommon varieties of stone. One final response. What is the proper comparison? You heard your opponent's argument that the proper comparison was not made. What should it – what is the standard? Well, the standard is that the comparison is to be made with building stone generally. In fact, McLarty, the seminal case, recites that. And the argument made by counsel is that that was not done by Mr. Horsberg. His report reflects that, in fact, it was done by Mr. Horsberg. And I've responded, I think, in brief. My time's so short I can't find the page reference where I identify where Mr. Horsberg indicated in his testimony during the hearing where that comparison had been made, despite counsel's claim that he didn't. One final matter is to say with regard to the NTSB case that the standards are different between the agencies. That's clear based upon the case cited restricting NTSB's reversal of an ALJ decision, which is materially different from the standard established here with regard to IBLA decisions established long ago in the United States v. Dunbar Stone case. My time is virtually up, unless the judges had other questions. No further questions. Thank you, counsel. Thank you. The case just argued will be submitted for decision.
judges: Goodwin, O'scannlain, Fisher